JLL

# EXCLUSIVE LISTING AGREEMENT

This Exclusive Listing Agreement ("Agreement") is dated as of June 22, 2026 (the "Effective Date"), between W/L Properties L.L.C. ("Owner") and Jones Lang LaSalle Americas, Inc. ("JLL" or "Broker").

1. **Basic Agreement Information**. This Section 1 contains the basic terms of this Exclusive Listing Agreement (this "Agreement") between the Owner (as herein defined) and the Broker (as herein defined). All other Sections of this Agreement are to be read in conjunction with the basic terms contained in this Section.

    a. Retention Effective Date: [The date upon which the Bankruptcy Court approves employment]

    b. Owner: W/L Properties, L.L.C.

    c. Broker: Jones Lang LaSalle Americas, Inc. ("JLL"), a Maryland corporation

    d. Designated Agent(s): For the purposes of this agreement Broker's Designated Agents shall be Chris Angelone and Zach Nitsche, to the exclusion of all other licensees sponsored by Broker.

    e. Property: The Shoppes at Larson Farm, located in Bristol, Connecticut, and further described in Exhibit A attached hereto.

    f. Term: From the Retention Effective Date through December 31, 2026 (subject to extension pursuant to Section 2).

    g. Post Term Protection Period: **90** days following the expiration of the Term.

    h. Success Fee: 3.5% of the Gross Purchase Price (as defined herein)

    i. Expense Reimbursement: Broker shall be reimbursed for its Reimbursable Expenses (as defined herein) in accordance with the terms of Section 5.

    j. Listing Price – A suggested listing price range of $9,000,000 - $11,000,000

2. **Renewal of Term.** The Term shall be as set forth in Section 1 (f) above; provided, however, that if Owner and Broker agree, as evidenced by and subject to the execution by Owner and Broker of a written amendment to this Agreement so stating, and subject to the approval of the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), then the Term shall be extended to such date as set forth more particularly in such written amendment.

3. **Exclusive Agency and Post Term Protection Period**. Owner engages Broker as Owner's exclusive agent with respect to the sale of the Property for the Term. The Owner agrees to refer all inquiries by prospective purchasers, capital sources, brokers and any other interested parties to Broker during the Term.

    Owner shall pay the Success Fee listed in 1(h) to Broker if Owner (a) sells the Property to a prospective purchaser within the Term, (b) obtains a binding offer from a prospective purchaser to purchase the Property during the Term that has been accepted or deemed acceptable by the Owner during the Term, or (c) sells the Property to a prospective purchaser pursuant to a contract for sale (as the same may be amended) entered into during the Post Term Protection Period, provided that in the instance of sale described in item (c) above, (i) Broker shall have submitted to Owner in writing the name of the prospective purchaser during the Term or prior to the date which is five business (5) days after the termination of the Term and/or (ii) such prospective purchaser shall be a party with whom Broker had presented offering materials regarding the sale of the Property. To be considered a prospective purchaser, they must have signed a confidentiality agreement or agreed to be bound to a purchase agreement in a form reasonably acceptable to the Debtor during the Term.

The terms “prospective purchaser” and “purchaser” as used herein shall include any nominee, affiliate, successor or assign of a prospective purchaser or purchaser.

Any and all references to the words “Property”, “sells the Property” or “sale of the Property” contained herein shall be deemed to include a sale of all or any portion of the fee interest, leasehold interest and/or all or any portion of any beneficial ownership interests of the entity that directly or indirectly owns the Property (including but not limited to the sale of all or any portion of any partnership interests, stock, etc. in the ownership entity).

4. **Success Fee**. In consideration of the services to be rendered by Broker pursuant to this Agreement, Owner shall pay to Broker the Success Fee noted in Section 1(h) above on the date of the closing of the sale of the Property via wire transfer or certified check. Owner hereby authorizes the title company, escrow agent or other closing agent to pay the fee to Broker at closing in the manner specified in the preceding sentence.

The term "Gross Purchase Price" as used herein shall mean the total consideration for the purchase and sale of the Property, and any and all costs or expenses paid by the prospective purchaser that would ordinarily and customarily be paid by the Owner (i.e., Broker’s fee, doc stamps, transfer stamps, and any other expenses of closing etc.).

In the event of a sale of less than a 100% interest in the Property, the Gross Purchase Price shall be adjusted to reflect a sale of a 100% interest in the Property.

If the closing of a sale is not completed for any reason whatsoever, then no Success Fee shall be due Broker with respect to that sale, however, Broker shall be entitled to the receipt of the Reimbursable Expenses as detailed in Section 1(i) and Section 5.in addition, if the prospective purchaser deposited non-refundable earnest money in connection with the execution of the applicable agreement and forfeits that earnest money deposit based on a failure to close, Broker shall be paid 10% of such earnest money deposit, less any amounts paid by Owner on account of Reimbursable Expenses.

5. **NOTICE REGARDING COMPENSATION**. THE AMOUNT OR RATE OF REAL ESTATE BROKER COMPENSATION IS NOT FIXED BY LAW. IT IS SET BY EACH BROKER INDIVIDUALLY AND MAY BE NEGOTIABLE BETWEEN OWNER AND THE BROKER.

6. **Expense Reimbursement.** Owner agrees to reimburse Broker within 10 days after receipt of an invoice thereof, but in no event later than the earlier to occur of (a) the Closing Date (if any) or (b) the expiration or termination of this Agreement, whichever occurs first, for any and all out of pocket relating to photography for the marketing of the Property (including aerial photographs), which are estimated to total not more than [$1,000] (the “Reimbursable Expenses”).

7. **Owner Approval of All Offering Materials**. Owner shall pre-approve all sales and marketing materials (and the statements contained therein) and shall be deemed to have approved them to the extent Owner fails to notify Broker in writing of any objection thereto within five (5) days of Broker’s presentation thereof to Owner.

8. **Marketing of the Property and Marketing Status Reports**. Upon Owner’s written request, Broker shall submit to Owner the names of any prospective purchaser prior to dissemination of any sales and marketing materials to such prospective purchaser.

From and after the date which is forty-five (45) days following the Effective Date, Broker shall reasonably cooperate with any licensed real estate brokers or agents (the “Cooperating Agent”) representing a prospective purchaser; provided, (a) the prospective purchaser has not been previously contacted by Broker as part of Broker’s marketing of the Property; (b) prospective purchaser notifies Broker in writing that (i) the Cooperating Agent is representing the prospective purchaser in the acquisition of the Property and (ii) the prospective purchaser and the Cooperating Agent both agree in writing (A) that the prospective purchaser will pay the Cooperating Agent’s fees, commissions, costs and expenses in connection with any transaction or potential transaction involving the purchase of the Property (any such transaction or potential transaction, a “Transaction”) and (B) to indemnify, defend and hold both Broker and Owner harmless from and against any claims, costs or expenses that the Cooperating Agent might make against Broker or Owner; and (C) Broker shall not be obligated to share any part of its Success Fee as herein above with any Cooperating Agent unless otherwise agreed by Broker in Broker’s sole and absolute discretion. No additional fee will be due if a Cooperating Agent is involved in the transaction.

Broker shall provide Owner (as requested by Owner) with written reports every two weeks summarizing all activities of Broker in connection with the Property, including summaries of marketing and media efforts and the number of days of services provided to Owner by Broker's professionals during each two-week period.

Broker shall maintain records of the offering package or the portions of the offering package delivered to a prospect and the dates such deliveries were made. Broker shall also keep other adequate books and records pertaining to its services under this Agreement and shall allow Owner upon prior written notice to examine such books and records, at any time prior to the date that is one hundred eighty (180) days following the end of the Term. During such period, Broker shall make available to Owner all records and correspondence relative to specific prospective purchasers as may be necessary or helpful to Owner.

9. **Broker's Duties and Responsibilities.** Without limitation of any other service to be provided by Broker as described herein, during the Term Broker shall provide the following services: (1) accept, deliver and present to Owner offers and counteroffers to buy, sell, or lease the Property; (2) assist Owner in developing, communicating, negotiating, and presenting offers and counteroffers until a sale or lease agreement is signed and all contingencies are satisfied or waived; and (3) answer Owner's questions relating to any offer, counteroffer, notice or contingency. Broker shall market the Property to prospective purchasers as Broker deems appropriate in its sole and absolute discretion, unless Owner otherwise so specifies to Broker in writing pursuant to the Notice provision below.

10. **Broker's Employment**. Broker's employment is subject to the provisions of 11 U.S.C. § 327(a) and related provisions, orders of the Bankruptcy Court in *In re W/L Properties L.L.C.* 26-20444, and applicable fiduciary obligations to such bankruptcy estate. Nothing contained herein or in the relationship of Owner and Broker shall be deemed to constitute a partnership, joint venture or any other relationship between Owner and Broker except as may be expressly set forth in this Agreement. Broker does not have the authority to bind Owner or any potential purchaser to any contract to purchase or sell the Property. Owner fully understands that Broker has no authority to bind any potential purchaser and Owner has not and will not rely on any representation or statement to the contrary unless contained in a writing signed by the potential purchaser to be bound.

11. **Waiver of Claims**. Because damages under this Agreement that may be incurred by either party hereto are speculative in nature and are not subject to being estimated at the time of the execution of this Agreement, Broker and Owner hereby agree that neither Broker nor Owner shall be liable to the other for any special, consequential, incidental or punitive damages with respect to any claims relating to the Transaction(s) contemplated hereunder, even if the other party has been advised of the possibility of such damages and regardless of the nature of such other party's acts or failures to act, except to the extent that Broker or Owner shall have been adjudicated by the Bankruptcy Court or another court of competent authority to have acted in an manner that constitutes gross negligence, willful misconduct, or malpractice that rises to a level equivalent to gross negligence or willful misconduct, in which case such waiver shall not apply to such conduct. Furthermore, by their respective execution, Broker and Owner waive any right to claim or seek any such damages except as set forth above. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

12. **Indemnities.**

(a) Owner agrees to indemnify, defend and hold harmless "Broker" from and against any third party Claims (as hereinafter defined) as and to the extent arising as a result of, or otherwise in connection with (a) any misrepresentations or material omissions in any marketing information approved in writing by Owner or any other information Owner may elect to provide to (or refrain from providing to) "Broker" or any other party to any Transaction; (b) any photographic images, time lapse renderings, sketches or other media, provided to Broker by the Owner for use in connection with the marketing of the Property; (c) any Owner default under any agreement relating to the Transaction; and (d) Owner's gross negligence or willful misconduct, provided, however, that to the extent that a claim for indemnification arises while Owner remains in bankruptcy, Broker shall be required to file a motion seeking permission of the Bankruptcy Court to pursue its claim for indemnification against the Owner

(b) Broker agrees to indemnify, defend and hold harmless, "Owner" from and against any and all third party Claims as and to the extent arising as a result of or otherwise in connection with (a) any breach by Broker under this Agreement and/or (b) Broker's gross negligence or willful misconduct in the performance of its duties hereunder.

(c) As used herein, (i) "Claims" means any and all fines, losses, damages, suits, claims, actions, demands, liabilities, costs and expenses (including, without limitation, attorney's fees), and (ii) "Owner" and "Broker" (in each instance with quotations included) shall include any officer, director, shareholder, partner, member or employee thereof.

(d) The provisions of this Section shall survive the expiration or earlier termination of the Term and/or this Agreement for a period of one (1) year from the date of the earlier to occur of such expiration or earlier termination.

13. **Limitation of Liability**. Notwithstanding the terms of the preceding paragraph, Broker and Owner both agree that if Broker should become liable to Owner for any cause whatsoever arising out of, or in any way related to this Agreement (including but not limited to any indemnification obligations hereunder), then the liability of Broker shall not exceed t$385,000 which is the estimated fee due on the high value range of $11,000,000. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

14. **Legal Costs and Expenses**. Without limiting any other provisions set forth herein, in the event that Broker is subjected to legal process, discovery or called as a witness in any proceedings regarding any aspect of the Transaction, Owner agrees to pay any third-party costs (including, without limitation, attorney fees) incurred in connection with Broker's response to, or participation in, such proceedings (unless and to the extent such proceedings arise solely as a result of Broker's negligence or willful misconduct) to the extent allowed by the Bankruptcy Court after application and notice of a hearing and/or opportunity to object.

15. **Notice Provisions**. Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed given when delivered (a) by registered or certified mail, United States Postal Service, postage prepaid, return receipt requested to the respective address listed below; (b) by email, with confirmation of receipt, followed by a copy given in accordance with the provisions in subparagraph (a) or (b); or (c) by a generally recognized commercial courier service or overnight delivery service, with receipt for delivery. Notwithstanding the foregoing, Broker shall not be deemed to have received notice pursuant to this Agreement unless such notice is also provided to Broker's Designated Agent(s) (as defined in the Basic Agreement Information). Addresses for purposes of the foregoing are:

| | | |
|---|---|---|
| To Broker: | Jones Lang LaSalle Americas, Inc. | |
| | Address | One Post Office Sq, Suite 1100 |
| | Address | Boston, MA 02109 |
| | Attn: | Chris Angelone |
| | Phone: | 617-316-6466 |
| | Email: | Chris.angelone@jll.com |

| | | |
|---|---|---|
| To Owner: | W/L Properties LLC c/o Edward P Jurkiewicz, Esq | |
| | Address | 932 East Main Street, Suite 1 |
| | Address | Torrington, CT 06790 |
| | Attn: | Edward Jurkiewicz |
| | Phone: | 860-626-1333 |
| | Email: | Ed.lawjur@gmail.com |

16. **Owner's Disclosures**. Owner shall disclose to Broker and to prospective purchasers any information that Owner has, to the best of Owner's knowledge, regarding the physical and financial condition of the Property, including, but not limited to, rent rolls, operating statements, general ledgers, the presence and location of asbestos, mold, PCB transformers, and other toxic, hazardous or contaminated substances in, on, under or about the Property, as well as any other environmental or engineering or structural issues the Owner is aware of. Additionally, Owner shall disclose material adverse changes to any of the above during the Term or Post Term Protection Period.

17. **Broker's Disclosures**. Owner acknowledges that Broker is a full service real estate services firm and a financial intermediary and may represent, through listing agreements, debt placement engagements, correspondent production and servicing contracts or otherwise, (a) prospective purchasers and/or tenants of the Property, (b) current tenants of the Property, (c) owners, mortgagees or tenants of property that have the same or similar qualities and characteristics as the Property and which may compete with the Property and/or (d) parties having a security interest

in the Property. Subject to the terms set forth below, Owner hereby consents to any dual representation or competitive relationship that may be created by Broker's various engagements and agrees not to use any such relationship as the basis for a claim against Broker (provided that Broker will endeavor to disclose any such competing relationships to Owner), provided, however, that, throughout the Term, so long as the Owner remains in bankruptcy, JLL professionals shall not represent a prospective purchaser in connection with a bid or proposal to purchase the Property.

Without limiting the foregoing, Owner understands that Broker may also be contacting select lending or financial institutions regarding their interest in financing the Property in order to maximize proceeds for Owner. In some cases, potential purchasers may request Broker's assistance in placing debt on the Property to consummate the purchase of the Property. Broker will disclose to Owner all potential relationships between potential purchaser and Broker with respect to any such financing and request Owner's permission to assist potential purchasers with the financing of the Property. Owner shall have the right, in its sole and absolute discretion, to either approve or decline to grant permission for Broker's representation of a purchaser in connection with obtaining financing for the acquisition of the Property.

18. **Intentionally Deleted.**

19. **Intentionally Deleted.**

20. **Purchase and Sale Agreement, Partnership Agreement and Closing Statement**. Owner agrees to provide to Broker no later than within five (5) business days: (i) a copy of the fully executed purchase and sale and/or partnership agreement for the Property when executed by all parties; and (ii) a copy of the fully executed closing statement when the sale of the Property is closed.

21. **Advertising**. Upon the consummation of a sale of the Property, Broker shall have the right to issue press releases regarding the transaction. Additionally, Broker may advertise such sale, provided that such advertisement shall not include any details of the terms of the sale other than Broker's participation in the Transaction, and the identity of the purchaser and seller. Broker may request to include additional details regarding the terms of the sale, but any such additional details shall be subject to Owner's written consent, not to be unreasonably withheld or delayed.

22. **Intentionally Deleted**.

23. **Severability**. If any term or provision of this Agreement is held to be void or unenforceable, such term or provision will be ineffective and separable from the remaining terms and provisions of this Agreement without invalidating the remaining terms or provisions of this Agreement. In lieu of any invalid or unenforceable provision, a valid and enforceable provision will automatically be added containing terms as similar as possible to the ineffective provision and the parties request the court or any arbitrator to whom disputes relating to this Agreement are submitted to reform the ineffective provision in accordance with this paragraph.

24. **Right to Assign**. Any Transaction arising under this Agreement is intended to constitute the sale or financing of real estate or an interest therein, and not the sale of a security. In the event that, in the reasonable judgement of Broker, a Transaction under this Agreement may constitute the sale of a security, Broker shall have the right to assign its rights and obligations hereunder to any of its affiliates that hold appropriate securities broker dealer licenses, and such affiliate shall assume all rights and obligations of Broker hereunder with respect to services requiring a securities broker dealer license.

25. **Photography and Drawings**. If the photography, media, time lapse images and other work product (collectively referred to as the "Work Product") of a professional photographer engaged in connection with the marketing of the Property, is requested by Owner for use in any way other than Broker's marketing efforts, Broker shall use commercially reasonable efforts to ensure that Owner may (at its sole cost and expense) obtain usage rights of the Work Product at an additional charge from the photographer.

26. **Waiver of Jury Trial**. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY PERFORMANCE OF OR FAILURE TO PERFORM ANY OBLIGATION HEREUNDER AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE SOLE

JURISDICTION TO ADJUDICATE ANY DISPUTES ARISING UNDER THIS AGREEMENT UNTIL THE OWNER'S BANKRUPTCY CASE IS CLOSED OR DISMISSED Th

27. **OFAC**. Owner represents and warrants that neither it nor any of its employees is a person or entity with whom U.S. entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action.

28. **Non-Discrimination**. This agreement is subject to the Connecticut General Statutes prohibiting discrimination in commercial and residential real estate transactions (C.G.S. Title 46a, Chapter 814c).

29. **Intentionally Deleted.**

30. **Miscellaneous.** This Agreement contains the entire agreement between the parties and supersedes any and all discussions or agreements, representations or statements, oral or written, made prior to or contemporaneously with the execution hereof. This Agreement may be executed in one or more counterparts, each of which counterpart a) shall be deemed an original, b) shall be binding upon and inure to the benefit of the parties hereto and their heirs, successors and assigns, and c) shall be effective and valid under applicable state law. The parties agree that an electronic signature will be considered an original signature. Any agreement hereafter made shall be ineffective to modify this Agreement, unless such agreement is in writing and signed by both Owner and Broker. The individual(s) executing this Agreement on behalf of Owner, warrant and represent that, with respect to the agreements contained herein, he or she has the authority to bind Owner, persons owning an interest in Owner. Each of Owner and Broker agrees to offer the Property in compliance with all applicable anti-discrimination laws, statues, and ordinances. Owner agrees to comply with all applicable federal, state, and local, laws, regulations, codes, ordinances, and administrative orders which pertain to and have jurisdiction over the Property and Owner, including without limitation, the 1964 Civil Rights Act, the Foreign Investment in Real Property Tax Act (FIRPTA), the Comprehensive Environmental Response Compensation Act, the Americans with Disabilities Act, and all amendments thereto as may apply.

***[SIGNATURE PAGE FOLLOWS]***

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first above written.

**BROKER: Jones Lang LaSalle Americas, Inc. ("JLL"), a Maryland corporation**

| | |
|---|---|
| **By:** ______________________________ | **By:** ______________________________ |
| **Approved Signatory** | **Sponsoring Licensed Broker** |

Agreed and accepted as of the __________ day of July, 2026.

**OWNER: W/L Properties L.L.C.**

By: ______________________________

Name: ______________________________

Title: ______________________________

**EXHIBIT A**

**PROPERTY NAME:** The Shoppes at Larson Farm

**PROPERTY ADDRESS:** 1379 Farmington Avenue, Bristol, Connecticut 06010

**LEGAL DESCRIPTION:**